NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

SHANE D., KASSANDRA D., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, T.D., *Appellees*.

No. 1 CA-JV 20-0245
FILED 3-16-2021

Appeal from the Superior Court in Mohave County
No. S8015JD201900028
The Honorable Megan McCoy, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Shane D.*

Law Office of Michael & Casey, Phoenix
By Robert Casey
*Counsel for Appellant Kassandra D.*

Arizona Attorney General's Office, Mesa
By Tom Jose
*Counsel for Appellee Department of Child Safety*

---

## MEMORANDUM DECISION

Presiding Judge Paul J. McMurdie delivered the Court's decision, in which Judge Cynthia J. Bailey and Judge Lawrence F. Winthrop joined.

---

**McMURDIE**, Judge:

**¶1**          Shane D. ("Father") and Kassandra D. ("Mother") (collectively "Parents") appeal from their parental right's termination for Connor, age ten.[1] For the following reasons, we affirm.

### FACTS[2] AND PROCEDURAL BACKGROUND

**¶2**          Before moving to Arizona in December of 2017, Mother and Father lived in Nebraska, where they had been intermittently involved with Nebraska Child Protective Services. Mother has been diagnosed with bipolar disorder and schizophrenia and has a history of attempting suicide. While in Nebraska, she was believed to be abusing prescription medications. Father was also suspected of substance abuse.

**¶3**          In February 2019, the Arizona Department of Child Safety ("DCS") in Kingman received a report that Mother engaged in domestic violence against Father in front of Connor and his older half-brother. The report alleged Mother put a knife to Father's throat during an argument. As a result, DCS offered in-home services to the family. Father, who worked as a long-haul truck driver and spent much of his time traveling for work, did not participate in the services.

**¶4**          In April 2019, DCS learned that Mother attempted suicide and was hospitalized. Connor was at school when the suicide attempt occurred, and DCS could not reach Father before Connor needed to be picked up from school. Because neither parent was available to care for Connor, DCS placed him with a family friend. When DCS was able to reach Father later that day,

---

[1]          To protect the identity of the child, we refer to him by a pseudonym.

[2]          We view the evidence and draw all reasonable inferences from it in the light most favorable to sustaining the court's decision. *Jordan C. v. ADES*, 223 Ariz. 86, 93, ¶ 18 (App. 2009).

it informed him there had been a report that he was using drugs and asked Father to submit to drug testing. Father agreed to submit to testing and said he would retrieve Connor from the family friend's house that evening. Father did not pick up Connor nor submit to drug testing. On April 29, Connor was adjudicated dependent as to Mother and continued to live with the family friend.

¶5        In May 2019, after Father returned from work-related travel, he entered into a mediation agreement with DCS in which he agreed to engage actively in services. Father requested and was provided information identifying service providers. In exchange, DCS agreed to consider moving the children back with Father under a safety plan with in-home services. Father was referred to several reunification services, including a community-based substance abuse treatment program, drug testing, and supervised visitation.

¶6        When Mother was released from the hospital, DCS referred her for reunification services. In May, Mother attended one supervised visit but missed her behavioral health appointment. She informed the provider she planned to visit another behavioral health clinic, but there is no record that she was seen at another clinic.

¶7        Mother and Father left Arizona together in June 2019 on a long-distance trucking job. Other than one supervised visit in June, Mother and Father stopped engaging in Kingman services. At a dependency review hearing in July, Father objected to DCS's request to find that it had made reasonable efforts to prevent or eliminate the need for Connor's removal. The court found Connor dependent as to Father and, over Father's objection, that DCS had made reasonable efforts. Connor remained in placement in Arizona until November of 2019.

¶8        On August 2, 2019, Mother called DCS and requested phone visitation with Connor. She explained that Father had kicked her out of the truck, and she was looking for shelter space. She provided her mother's phone number and address in Nebraska so DCS could set up the referral for visitation. Mother received in-patient care in Nebraska for medication management over four days in early August 2019. Mother was seen for a psychological evaluation at a behavioral healthcare provider in Nebraska on August 28, 2019.

¶9        In September, DCS referred Father to services for video visitation with Connor after he made the request. By October, Father lived

in Nebraska, and DCS received conflicting reports about whether he was living with Mother or with his father, who also lived in the area.

¶10        Mother participated in video visits with Connor twice a week for September and October. By October, Mother reported that she participated in a domestic violence program and received one-on-one counseling. A DCS report from October 18 noted that Mother called DCS and asked about drug testing. DCS informed her that a hair follicle test would be appropriate if she could afford it. DCS reported that Mother was paying out of pocket for drug testing and other services, and she was unable to afford the cost of submitting regular test results. Mother told DCS she had difficulty finding treatment whenever she moved to a new state. DCS recommended she continue to receive medical care and participate in therapy. A DCS court report prepared October 21 suggested that Mother appeared to be functioning adequately to parent her child.

¶11        In October, Mother reported to a healthcare provider that she moved out of her mother's home and into a motel so that Connor's placement with her mother would be approved. Mother also reported a history of domestic violence with Father and explained that they planned to participate in marriage counseling because Father had recently broken up with his girlfriend. At a dependency review hearing on October 30, counsel for Mother and Father reported on the status of their engagement in services and reported positively on their involvement and video visitation. Neither parent objected to the reasonableness of DCS's efforts.

¶12        In November, the court ordered that Connor be placed with his maternal grandmother in Nebraska.[3] Connor's grandmother initially offered to supervise visits for Mother and Father, but after several visits, she informed DCS she no longer wished to perform that role for safety

---

[3]        We caution the juvenile court about continuing to exercise jurisdiction over a case once the parents and child no longer reside in Arizona. *See* A.R.S. § 25-1032(A) (court has continuing jurisdiction over the child *until* the court determines that the child and parents or person acting as a parent do not reside here); *Monique B. v. Duncan*, 245 Ariz. 371, 376, ¶ 19 (App. 2018) ("Even after the parties move away from the original state, a determination by the original state that it no longer is exercising exclusive, continuing jurisdiction applies . . . only after an express judicial determination."). Because neither Arizona nor Nebraska recognized that Nebraska was the more appropriate forum to adjudicate the severance, Arizona did not lose jurisdiction.

reasons and because she wanted to shield Connor from Mother and Father's continuing discord.

**¶13** In December, Father was arrested in Idaho for possession of controlled substances. After his arrest, Father returned to Nebraska, where he began residing with Mother. In a January report, DCS noted that it was still waiting for a hair-follicle test from Mother, and Mother had suspended her one-on-one counseling sessions because they interfered with her employment.

**¶14** In January, Connor was diagnosed with an intermittent explosive disorder, a disorder characterized by "recurrent behavioral outbursts representing a failure to control aggressive impulses[.]" The therapist who evaluated Connor noted that he had been subjected to emotional abuse when Father used Connor as a shield to prevent Mother from assaulting Father. Connor's teachers reported that his progress was delayed compared to his peers.

**¶15** During a phone call with DCS on January 10, Mother said that she was living with Father and that her participation in counseling and other services had lapsed. Mother seemed interested in treatment options for Father and asked the case manager if he would like to speak with Father, but the case manager declined. Father submitted three urine samples in January and each tested negative. At the review hearing on January 22, neither parent objected to the court's finding that DCS was making reasonable efforts.

**¶16** In February 2020, Mother called the police while she was barricaded in a room away from Father in the home they shared to report an incident of domestic violence. Mother subsequently moved into a domestic violence shelter, and Father moved in with his father. Parents were offered supervised visitation toward the end of February, but the visits were suspended due to their inappropriate behavior at the visits.

**¶17** At a team decision-making meeting on March 6, Father reported that he had enrolled in substance-abuse treatment, was about to start domestic-violence classes, and had already submitted a hair follicle for drug testing. After the meeting, Mother obtained a substance-abuse evaluation and enrolled in a domestic-abuse program.

**¶18** After an evidentiary hearing on April 8, the court changed the case plan from reunification to severance and adoption and ordered DCS to file a termination motion. A minute entry from the April 8 permanency hearing noted that the DCS case manager "addressed [the] concerns of the

lack of guidance from the Department for the Parents to comply with services." DCS moved to terminate Mother and Father's rights based on neglect and nine months' time-in-care. Also, DCS alleged Father was unfit because of his chronic substance abuse and that Mother was unfit on the ground of mental illness.

¶19　　　　On April 22, there was another domestic violence incident between Mother and Father, which resulted in a visible injury to Father's face. In June, Father was charged with domestic assault for alleged acts on May 6, 2020. On June 6, Mother and Father signed a lease for an apartment and lived together at the time of the trial.

¶20　　　　The juvenile court conducted a contested severance hearing in July 2020. The court heard evidence about Mother's behavioral-health status, Father's substance abuse, the constant turmoil and domestic violence between Mother and Father, and their engagement in services throughout the case. At the hearing, Mother and Father challenged the adequacy of DCS's reunification efforts. When asked whether DCS was obligated to offer services to Parents in Nebraska after they left Arizona, the case manager answered:

> That's on the parents. It's a lot easier for them to be able to contact those services, make those appointments, and know what places to even go to in their given area. It would be just as difficult . . . to implement something in Phoenix, although I have a greater chance of obtaining resources . . . to assist them with that, I still don't know what they offer in that area.
>
> \*　　　\*　　　\*
>
> I don't have the ability to coordinate with a psychologist or psychiatrist out of [Arizona]. I wouldn't know who they could go to [in Nebraska]. Again, if we don't have an address of where they reside, I wouldn't even know where to begin to look for that type of professional to perform that evaluation. And it also would, there again, require mental health background, case notes, prior drug testing, other information relevant to be able to come to that informed decision that the evaluation would make.

¶21　　　　After considering the evidence presented at trial, the court terminated Mother and Father's parental rights after concluding that each ground for termination had been proven by clear and convincing evidence and termination was in Connor's best interests. Mother and Father

appealed, and we have jurisdiction under A.R.S. §§ 8-235(A) and 12-120.21(A)(1).

## DISCUSSION

**¶22** On appeal, Father argues it was error for the juvenile court to terminate his parental rights because the State failed to prove by clear and convincing evidence that Father neglected Connor. Father also claims that DCS failed to provide him with appropriate reunification services. Mother and Father both argue that the State failed to satisfy its obligation to make reasonable efforts to preserve the family relationship and prove by a preponderance of the evidence that it was in Connor's best interests to terminate their parental rights. DCS argues Mother and Father waived review of the adequacy of DCS's efforts by failing to timely object. DCS also argues we can summarily affirm the termination of Mother's parental rights because she failed to challenge the neglect ground.

**¶23** At the outset, we note that while Mother failed to challenge the neglect ground, she did challenge the reasonableness of DCS's efforts and the court's finding that termination was in Connor's best interests. Each of these must be proven before the court may terminate a parent's rights based on neglect under A.R.S. § 8-533(B)(2). *See Mary Ellen C. v. ADES*, 193 Ariz. 185, 192, ¶¶ 33–34 (App. 1999); Ariz. R.P. Juv. Ct. 66(C). Therefore, we cannot summarily affirm the termination of Mother's rights on the neglect ground as urged by DCS.

**¶24** Father only challenges the court's findings concerning Connor's best interests and DCS's reunification efforts on the substance abuse and nine months' time-in-care grounds. On all three grounds alleged against her, Mother challenges only the reasonableness of DCS's reunification efforts and that termination was in Connor's best interests. Because they have not challenged the court's other findings, they concede those findings' accuracy on appeal. *Britz v. Kinsvater*, 87 Ariz. 385, 388 (1960). "If clear and convincing evidence supports any one of the statutory grounds on which the juvenile court ordered severance, we need not address claims pertaining to the other grounds." *Jesus M. v. ADES*, 203 Ariz. 278, 280, ¶ 3 (App. 2002). Because we conclude that Mother and Father waived review of the adequacy of DCS's efforts and reasonable evidence supported the court's finding that termination was in Connor's best interests, we do not address the remaining issue raised by Father that DCS failed to prove Father neglected Connor.

### A. Mother and Father Waived Review of the Adequacy of the Services Provided to Them by Failing to Timely Object.

**¶25** DCS argues Mother and Father each waived the adequacy of DCS's reunification efforts because Father objected to its efforts only once before trial while neglecting to engage in the services offered, and Mother did not object at all before trial. After reviewing the record, we conclude that Mother and Father each failed to timely bring the adequacy of DCS's efforts to provide services in Nebraska to the juvenile court's attention and therefore waived review of the issue.

**¶26** Before seeking to terminate a parent's rights on the out-of-home placement grounds, DCS must make a diligent effort to provide appropriate reunification services. A.R.S. § 8-533(B)(8). To meet its obligation, DCS must "identify the conditions causing the child's out-of-home placement, provide services that have a reasonable prospect of success to remedy the circumstances as they arise throughout the time-in-care period, maintain consistent contact with the parent, and make reasonable efforts to assist the parent in areas where compliance proves difficult." *Donald W. v. DCS*, 247 Ariz. 9, 23, ¶ 50 (App. 2019). Also, before the court may terminate parental rights, DCS is constitutionally obligated to make reasonable efforts to reunify the family. *Mary Ellen C.*, 193 Ariz. at 192, ¶ 33.

**¶27** We have previously explained that "[i]n determining whether the grounds for termination have been satisfied, the juvenile court is in a much better position than this court to evaluate the effectiveness and impact of the services provided, as credibility determinations may be required to weigh the evidence presented." *Shawanee S. v. ADES*, 234 Ariz. 174, 178, ¶ 15 (App. 2014). The dependency process is designed to allow the court to review the parties' progress in meeting the case plan's goals. *Id.* The State is required to present an updated case report at periodic reviews before the court, providing the parties an opportunity to address concerns so that unnecessary delays can be avoided. Ariz. R.P. Juv. Ct. 58(A), (C).

**¶28** Delays are especially harmful when a child must deal with the uncertainty and insecurity of temporary placement for the case's duration. Whether a case ultimately results in reunification or termination of parental rights, it is typically to the benefit of all that a case is resolved expeditiously. For this reason, it is essential that parents timely voice their concerns about services to the court. *Shawanee S.*, 234 Ariz. at 178–79, ¶ 16.

**¶29**       A parent who does not object to the adequacy of the State's efforts to provide court-ordered services is precluded from challenging the services' sufficiency on appeal. *Shawanee S.*, 234 Ariz. at 178–79, ¶¶ 16–18. DCS is obligated both constitutionally and by statute to provide parents with reunification services before it moves to terminate their parental rights. Still, though this obligation extends even beyond Arizona's borders,[4] it "does not free a parent from the need to raise a timely objection if the parent believes services are inadequate." *Id.* at 178, ¶ 13.

**¶30**       Here, Mother explained to DCS in August 2019 that she struggled to pay for services independently and had difficulty finding Nebraska service providers. But it does not appear that Mother ever brought the issue to the court's attention despite ample opportunity to do so. Mother does not address the waiver issue on appeal, and our review of the record has not uncovered an instance in which Mother raised the matter to the court before the trial.

**¶31**       Father objected once to the court's finding of reasonable efforts at a review hearing in July 2019. However, at the time of that hearing, Father had only recently left Arizona where he had failed to engage in the services DCS had provided and was living out of his semi-truck, a situation that arguably makes referrals for most services futile. Because of Father's circumstances and actions at the time of the hearing, any legitimate concerns Father developed later were not raised by this objection.

**¶32**       DCS acknowledges that a minute entry from the April 8, 2020, evidentiary hearing indicated that the case manager "address[ed] the concerns of the lack of guidance from the Department for the Parents to comply with services." But the court ultimately found that DCS's efforts were reasonable, and neither parent objected to the court's finding. Without a transcript of the hearing, we cannot conclude that Mother or Father brought the inadequacy of DCS's services to the court's attention based on this minute entry alone. *See Bliss v. Treece*, 134 Ariz. 516, 519 (1983). ("Where the record is incomplete, a reviewing court must assume any evidence not

---

[4]       At the trial, the DCS case manager denied responsibility for referring and paying for reunification services in Nebraska. However, until another court assumes exclusive jurisdiction, or other enumerated circumstances exist, the obligation to provide such services persists and extends across state lines. *See* A.R.S. § 8-846 (enumerating circumstances under which DCS is not required to provide services); *See Donald W.*, 247 Ariz. at 26–27, ¶¶ 69-73 (DCS required to provide services to a parent living in California).

available on appeal supported the trial court's action."). By not timely bringing their concerns to the court's attention, Mother and Father waived review of the adequacy of DCS's efforts to provide reunification services to them in Nebraska.

**B.      Reasonable Evidence Supports the Court's Finding that it was in Connor's Best Interests to Terminate Mother and Father's Parental Rights.**

¶33      Mother and Father argue that DCS failed to present sufficient evidence that termination of their parental rights was in Connor's best interests. Termination of the parent-child relationship is in the child's best interests if the child will benefit from the termination or be harmed if the relationship continues. *Shawanee S.*, 234 Ariz. at 179, ¶ 20. We will affirm a termination order supported by reasonable evidence. *Jordan C.*, 223 Ariz. at 93, ¶ 18.

¶34      Here, the court determined that termination of the parent-child relationship would serve the child's best interests because it would further the adoption plan, which would provide Connor with permanency and stability. The court further explained that the relationship's continuation would cause Connor "to linger in care for an indeterminate period" because his Parents could not care for him. The court concluded that Parents' instability had harmed Connor as they entered and exited his life according to their circumstances. Also, the parent-child relationship's continuation would disrupt the appropriate attachment Connor was developing with his maternal grandmother. At the time of the severance hearing, the maternal grandmother served as Connor's placement and expressed a desire to adopt him.

¶35      The record supports the court's findings. At the trial, the court heard testimony about several domestic violence acts between Mother and Father in the proceeding months. The court also heard from Connor's therapist that the emotional trauma of witnessing domestic violence between Mother and Father could lead Connor to experience anxiety, depression, and to display disobedience at home and in school. The therapist testified that because Connor was already showing developmental delays, he needed to live in a stable environment. He also testified that grandmother's ability to remain a steady and consistent attachment figure in Connor's life was vital to continue the positive trend towards catching up to his peers developmentally. On this record, the court did not abuse its discretion by determining that termination was in the child's best interests.

**CONCLUSION**

¶36     We affirm the court's termination judgment.



AMY M. WOOD • Clerk of the Court
FILED:    AA